# United States Court of Appeals
## For the First Circuit

---

No. 99-1086

MELISSA F. WEBER, INDIVIDUALLY, and AS PARENT AND NATURAL
GUARDIAN OF SAMUEL M. WEBER, A MINOR CHILD

Plaintiff, Appellant,

v.

CRANSTON SCHOOL COMMITTEE, ET AL.

Defendants, Appellees.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

[Hon. Mary M. Lisi, U.S. District Judge]

---

Before

Boudin, Circuit Judge,
Bownes, Senior Circuit Judge,
and Lipez, Circuit Judge.

---

Richard J. Savage, for appellant.
Keith B. Kyle, with whom Hodosh, Spinella, & Angelone was
on brief, for appellees.

---

May 8, 2000

---

**LIPEZ, Circuit Judge**. Melissa Weber, mother of Samuel M. Weber, filed a seven-count complaint in the district court for the District of Rhode Island against the Cranston School Committee, committee members, and Cranston city officials in their individual and official capacities pursuant to 42 U.S.C. §§ 1983 and 1985, the First, Fourth, and Fourteenth Amendments, the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12131-12134, Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, and the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400-1415. The district court granted summary judgment for the defendants as to all counts in Weber's complaint.

Weber limited her appeal from the district court's decision to Count IV, a claim of illegal retaliation pursuant to Section 504 of the Rehabilitation Act and 42 U.S.C. § 1983. Count IV of the complaint charges that the defendants retaliated against Weber for her complaints about the school district's failure to implement her son's Individualized Education Plan by denying her access to her son's school records, restricting her communications with his teachers, and threatening to report her to the state child welfare agency. The district court found that Weber's illegal retaliation claim merely rephrased prior

claims that the district court had already rejected, namely her Count II claim that the defendants' retaliation infringed on her First Amendment rights and her Count III claim that she was denied equal protection under the Fourteenth Amendment because other parents could access their children's records and teachers. Alternatively, the district court ruled that Weber's Count IV claim was barred because of her failure to exhaust administrative remedies specified by IDEA. IDEA requires such exhaustion prior to bringing a civil action pursuant to other federal laws protecting the rights of children with disabilities if the relief sought is available under subchapter II of IDEA, entitled "Assistance for Education of All Children with Disabilities." See 20 U.S.C. § 1415(*l*). Such relief is sought through the administrative due process hearing provided in subchapter II of IDEA. See 20 U.S.C. § 1415(f). Agreeing with this alternative ruling on the failure to exhaust administrative remedies, we affirm the decision of the district court.

## I.  BACKGROUND

This case has a complicated and contentious history. Samuel Weber entered the Cranston public school system ("CPS") on January 6, 1993, identified as a disabled child in need of

special education services under IDEA.[1]  Samuel received an Individualized Education Plan (the "Plan") pursuant to IDEA that described his educational objectives for the school year and the services necessary to achieve these objectives.[2]  One of the services specified in Samuel's Plan was phonics instruction. After Weber approved Samuel's 1993-94 Plan, Principal Margaret Day told Weber that the school system planned to "mainstream" Samuel by removing him from his special education classroom and integrating him into a standard curriculum class.  In addition, Weber learned that CPS was instituting a new language curriculum which did not include phonics.  Shortly after Samuel was moved

---

[1]IDEA is a comprehensive federal education statute which grants disabled students the right to a public education, provides financial assistance to states to meet their educational needs, and conditions a state's federal funding on its having in place a policy that ensures that a "free appropriate public education" is available to all children with disabilities.  20 U.S.C. § 1412(a)(1). A stated purpose of IDEA is "to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for employment and independent living."  Id. § 1400(d)(1)(A).

[2]An Individualized Education Plan is a written plan developed jointly by the local educational agency, the school teaching staff, the child's parents, and an expert qualified to interpret test results.  See 20 U.S.C. § 1414(d)(1)-(4).  The Plan records the child's present level of performance, sets annual educational objectives, and details the special services necessary to meet these objectives.  See id. § 1414(d)(1)(A). The Plan must be reviewed and revised annually.  See id. § 1414(d)(4)(A).

into a standard curriculum class, Weber met again with Principal Day and Samuel's teachers to discuss her concern about his phonics instruction under his Plan and the effects of mainstreaming.

After the conference, Weber remained dissatisfied with Samuel's phonics instruction. She contacted the Director of the Cranston School Committee's Special Education Services who assured her that CPS would schedule a meeting to discuss her concerns following the series of three meetings required to complete Samuel's education evaluation and Plan. On February 10, 1994, after attending the initial meeting to evaluate Samuel's test results, Weber filed a complaint pursuant to the federal complaint resolution procedure ("CRP") with the Office of Special Needs at the Rhode Island Department of Elementary and Secondary Education.[3] The complaint alleged that CPS had not

---

[3]The CRP regulations provide an administrative process to ensure state and local compliance with IDEA. These regulations were formerly known as the Education Department General Administrative Regulations ("EDGAR"). The EDGAR procedures provided "an administrative mechanism for assuring that a state complies with state-administered federal programs, including the [IDEA, but were] distinguished from the specific administrative procedures detailed in the [IDEA] itself." Christopher W. v. Portsmouth Sch. Comm., 877 F.2d 1089, 1090 n.2 (1st Cir. 1989). The July 8, 1992 amendments to EDGAR relocated these regulations to 34 C.F.R. Part 300, the implementing regulations for IDEA. While the EDGAR procedures applied to many statutes, the CRP regulations provide a procedure (distinct from the IDEA due process hearing) for filing complaints under IDEA. Under 34 C.F.R. §§ 300.660 and 300.662, states must adopt a written

followed Samuel's Individualized Education Plan with regard to phonics instruction or the provision of quarterly progress reports. Following an investigation, the Department found that CPS had complied with federal and state law. Weber did not appeal this decision to the Rhode Island Secretary of Education or pursue a due process hearing pursuant to IDEA. See infra Part III.

Weber next met with Principal Day, Cheryl Calvano, Director of the Cranston School Committee's Special Education Services, and Samuel's teachers. Pursuant to an agreement reached at that meeting that Samuel would transfer to the Norwood Avenue School, he entered a standard curriculum third-grade class in September 1994. In October, Weber met with Calvano and other school staff to review Samuel's progress. Following this meeting, Weber filed a second CRP complaint

---

complaint resolution procedure for receiving and resolving complaints that the state or a local agency is violating IDEA or its regulations. The state's procedure must limit the time for state investigation and resolution of complaints to sixty days, with extension only for "exceptional circumstances." 34 C.F.R. § 300.661(a)-(c). If either the complainant or the opposing school body is not satisfied with the state's resolution, he or she may request review of the state educational agency's decision by the U.S. Secretary of Education. See 34 C.F.R. § 300.661(d). Rhode Island implements the CRP mandates through the Rhode Island Regulations of the Board of Regents for Elementary and Secondary Education Governing the Special Education of Students with Disabilities.

alleging that CPS had denied her access to Samuel's educational records. The Rhode Island Department of Elementary and Secondary Education once again found CPS to be in compliance with the relevant state and federal regulations.

Shortly after Weber filed the second complaint, officials at the Norwood Avenue School allowed her to inspect Samuel's cumulative record file and a confidential file. In the confidential file, Weber found a handwritten note dated March 24, 1994, stating, "Agenda - Put parent on defensive," "shut her down," and a reference to a "restraining order." Weber responded to this note with a third CRP complaint seeking permanent removal of the handwritten note from Samuel's file.

Defendants contended that the note was the product of a meeting held to discuss "legal avenues or other relief" to address the "mounting burden of time imposed [by Weber's] telephone calls, letters, threats, harassment, and administrative litigation." Weber alleged that the defendants adopted a "secret agenda" of intimidation and retaliation. She specifically alleged that on March 28, 1994, a few days after the date of the handwritten note, Cranston's Assistant City Solicitor threatened to report her to the Rhode Island Department of Children, Youth, and Families in an off-the-record discussion during a due process hearing for her disabled

daughter, D.W.  The Rhode Island Department of Elementary and Secondary Education ordered the removal of the note, as well as the provision of a good faith hearing for Weber to express her grievances.

Following the third complaint, Weber decided that she wanted Samuel "declassified" as a disabled student and requested mediation to accomplish this action.[4]  One day prior to the scheduled mediation, Weber went to the Norwood Avenue School to see Principal Laura Albanese.  Albanese's secretary directed Weber to a meeting room, where she found Calvano, Albanese, and Samuel's teachers.  Weber believed that this was an Individualized Education Plan meeting to which she had not been invited, and that this action indicated that CPS did not intend to provide a good faith hearing on her grievances.  The next day at the mediation, Weber offered to allow Cranston to provide any services that they felt were necessary if they would agree to declassify Samuel as a disabled student.  CPS refused.

After the mediation, Weber alleged that Principal Albanese denied her access to Samuel's records.  She filed one

---

[4]IDEA requires that, "Any State educational agency or local educational agency that receives assistance under this subchapter shall ensure that procedures are established and implemented to allow parties to disputes . . . to resolve such disputes through a mediation process which, at a minimum, shall be available whenever a [due process] hearing is requested . . . . "  20 U.S.C. § 1415(e).

complaint with the Rhode Island Office of Equity and Access regarding access to Samuel's records, the refusal to terminate Samuel's Individualized Education Plan, and CPS's lack of good faith; she also filed a second complaint on behalf of her daughter.[5] The Office of Equity and Access issued a written

---

[5]The Office of Equity and Access complaint process is provided for by the General Laws of Rhode Island § 42-87-5(c) and § 16-39-1. Section 42-87-2 states that, "No otherwise qualified person with a disability shall, solely by reason of his or her disability, . . . be excluded from participation in or denied the benefits of any program, activity or service of, or, by any person or entity regulated, by the state or having received financial assistance from the state or under any program or activity conducted by the state . . . ." The statutory complaint procedure does not refer to IDEA. The inter-relationship between the Office of Equity and Access statutory complaint process and the CRP regulations of the Board of Regents is not entirely clear. Based on the materials available to us, it appears that the Board of Regents regulations only implement IDEA, while the Office of Equity and Access complaint procedure applies generally to the state's anti-discrimination law.

Rhode Island law provides that the state Department of Education is "empowered and directed to hear all complaints relating to violations of this chapter in the area of elementary and secondary education . . . in accordance with the process set forth in chapter 39 of title 16." R.I. Gen. Laws § 42-87-5(c). Chapter 39 of title 16 specifies that the Commissioner of Elementary and Secondary education will decide disputes arising under any law relating to schools or education with no cost to the parties involved. See id. § 16-39-1. Decisions of the Commissioner may be appealed to the Board of Regents for Elementary and Secondary education (the same body that promulgates the regulations effectuating the federal complaint resolution procedure ("CRP")). See id. § 16-39-3. Decisions of the commissioner and the board become final if judicial or administrative review is not sought within thirty days. See id. § 16-39-3.1. Final decisions are not subject to further judicial or administrative review. See id.

decision finding that CPS's actions with regard to Samuel constituted prohibited retaliation.[6] CPS appealed. At the time that the parties' filed their briefs before us, this appeal was still pending.

In April 1995, Weber requested an independent evaluation of Samuel, who was now in third grade. The testing revealed that Samuel read at an eighth-grade level, spelled at a seventh-grade level, and did arithmetic at a third-grade level. In September 1995, Samuel's parents placed him in a private school. Subsequently, Weber requested that CPS declassify Samuel. In March 1996, CPS concluded that Samuel was not disabled under IDEA.

---

[6] In relevant part, the decision stated:

> The explanation of the denial to terminat[e] . . . the Individualized Education Plan of Samuel Weber could be justified by focusing on the use of appropriate special education procedures . . . . However, . . . [t]he School Department's decision that the student must continue to receive special education services, coupled with the complainant's [Weber's] use of procedural safeguards and the [handwritten] note, when it was found, its contents and the timing of the complainant's request to terminate the Individualized Education Plan, yields the conclusion that the denial to terminate the Individualized Education Plan constituted a prohibited retaliation.

In July 1996, Weber filed her complaint in the district court for the District of Rhode Island, including her Count IV claim that CPS retaliated against her for enforcing her disabled child's rights under IDEA and Section 504 of the Rehabilitation Act. The disposition of Count IV is the only issue on appeal. The defendants challenge Weber's standing under Section 504 to pursue a claim of retaliation on her own behalf rather than on behalf of her disabled son. If Weber does have standing under Section 504, the defendants argue that she still cannot prevail because she failed to exhaust administrative remedies as required by IDEA, which specifies that a party seeking relief under the Rehabilitation Act must exhaust the administrative remedies provided by IDEA if the relief sought in the Rehabilitation Act claim is available under subchapter II of IDEA. See 20 U.S.C. § 1415(*l*). Weber maintains that she has standing to bring her retaliation claim under Section 504 of the Rehabilitation Act. She further argues that her suit is not barred by the IDEA requirement of exhaustion of administrative remedies because she would not have standing to bring a retaliation claim in her individual capacity pursuant to IDEA, and hence the relief she seeks under the Rehabilitation Act is not available to her under subchapter II of IDEA.

We review the grant of summary judgment de novo, see EEOC v. Amego, Inc., 110 F.3d 135, 141 (1st Cir. 1997), and draw all reasonable inferences in favor of the nonmoving party, see Champagne v. Servistar Corp., 138 F.3d 7, 8 (1st Cir. 1998).

## II.  A Parent's Standing to Sue in Her Individual Capacity under Section 504 of the Rehabilitation Act

Weber alleges that CPS violated Section 504 of the Rehabilitation Act by responding to her complaints relating to Samuel's education with a retaliatory policy to "put parent on defensive" and to "shut her down," restrictions on her access to school records, and a threat to report her to the Rhode Island Department of Children, Youth, and Families.  Relying on the language of the statute, the defendants insist that Weber lacks standing under Section 504 of the Rehabilitation Act because she is not a "qualified person with a disability" as defined by Section 504.[7]  They argue that she cannot seek redress under Section 504 for retaliation that has harmed her rather than her

_____

[7]We note that Weber meets easily the constitutional standing requirements of Article III: she alleges an actual injury, the injury can fairly be traced to the challenged conduct, and the injury can be redressed by the declaratory, injunctive, and monetary relief requested.  See  Valley Forge Christian College v. Americans United for Separation of Church & State, Inc., 454 U.S. 464, 472 (1982).  In her complaint, Weber seeks declaratory and injunctive relief and damages for each count of her complaint.

disabled child. To assess this standing argument, we must evaluate the interaction between Title VI of the Civil Rights Act of 1964, the Rehabilitation Act, and the Department of Education regulations. The Rehabilitation Act prohibits discrimination against the disabled. Section 504 of the Rehabilitation Act mandates that, "No otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ." 29 U.S.C. § 794(a). The Rehabilitation Act was amended in 1978 to incorporate the "remedies, procedures, and rights set forth in title VI of the Civil Rights Act of 1964 [42 U.S.C.A. § 2000d et seq.]." Id. § 794a(2). The anti-retaliation regulation adopted pursuant to Title VI of the Civil Rights Act provides as follows:

> No recipient or other person shall intimidate, threaten, coerce, or discriminate against any individual for the purpose of interfering with any right or privilege secured by Section 601 of [the Civil Rights] Act or this part, or because he has made a complaint, testified, assisted, or participated in any manner in an investigation, proceeding or hearing under this part.

34 C.F.R. § 100.7(e). This regulation also applies to any right or privilege secured by the Rehabilitation Act. See id. § 104.61.

This broadly protective anti-retaliation regulation is firmly grounded in the enforcement provisions of Title VI and the Rehabilitation Act. Title VI extends its remedies to "any person aggrieved" by violations of the Act. 42 U.S.C. § 2000d-2 (stating that "any person aggrieved . . . may obtain judicial review of [any department or agency] action in accordance with chapter 7 of Title 5."). The Rehabilitation Act extends its remedies to "any person aggrieved by any act or failure to act by any recipient of Federal assistance . . . under section 794 of this title." 29 U.S.C. § 794a(a)(2). Courts have construed the phrase "any person aggrieved" as an expression of Congressional intent to accord standing to the fullest extent permitted by the case and controversy provision of Article III. See e.g., Trafficante v. Metropolitan Life Ins. Co., 409 U.S. 205, 208 (1972) (holding that the term "aggrieved person" in § 810(a) of the Fair Housing Act, which the Act defined to include "[a]ny person who claims to have been injured by a discriminatory housing practice," demonstrated Congressional intent to confer standing to the fullest extent permitted by Article III); Hackett v. McGuire Bros., Inc., 445 F.2d 442, 446

-14-

(3d Cir. 1971) (reaching the same conclusion regarding Title VII's language of "a person claiming to be aggrieved [under the Act].");  see also Gray v. Greyhound Lines, East, 545 F.2d 169, 176 (D.C. Cir. 1976) (same).  Consistent with the broad construction of the statutory enforcement language of Title VI and the Rehabilitation Act, the anti-retaliation regulation applies to "any individual" who has been intimidated, threatened, coerced, or discriminated against "for the purpose of interfering with [protected rights]" under Title VI of the Civil Rights Act or the Rehabilitation Act.  34 C.F.R. § 100.7(e);  see id. § 104.61 (incorporating the Title VI anti-retaliation regulation into the Rehabilitation Act).

Given the broad remedial provisions of Title VI and the Rehabilitation Act and the breadth of the anti-retaliation regulation adopted pursuant to those laws, it is not surprising that courts have accorded standing to non-disabled individuals suing because of retaliation for attempts to vindicate the rights of a disabled person.  In Hoyt v. St. Mary's Rehabilitation Center, 711 F.2d 864, 865 (8th Cir. 1983), the hospital shortened the plaintiff's visiting time with a patient after she complained about the patient's care. The court stated that the plaintiff, as the "next friend and daily visitor" of the disabled patient, had standing under Section 504 to assert

-15-

a claim of retaliation against her personally for complaints made on behalf of the patient. Id. at 867 (but ruling against the plaintiff's Section 504 claim for insufficient evidence that the retaliation was motivated by any complaints relating to discrimination against the patient); see also Ross v. Allen, 515 F. Supp. 972, 976 (S.D.N.Y. 1981) (granting standing to a school psychologist who was dismissed after she complained to the Board of Education about the suspension of a deaf student for behavioral problems). In Whitehead v. School Board for Hillsborough County, 918 F. Supp. 1515, 1522 (M.D. Fl. 1996), the court granted standing to the parents of a child with Down's Syndrome who sought damages under Section 504 for retaliation against them in their capacity as parents, noting that, "There is no limitation under [34 C.F.R. 100.7(e)] that retaliatory acts are only prohibited against the handicapped individual on whose behalf the § 504 complaint is being raised." But see Sanders v. Marquette Public Schs., 561 F. Supp. 1361, 1370 (W.D. Mich. 1983)(allowing standing for a disabled child, but denying it to her father who sought recovery for emotional distress and the expense of alternative schooling).

Although Congress could have limited the remedial provisions of the Rehabilitation Act to claims brought by or on behalf of disabled individuals, it did not do so in apparent

recognition of the fact that disabled individuals may need assistance in vindicating their rights from individuals who may have their own claim to relief under the Act. The anti-retaliation regulation set forth in 34 C.F.R. § 100.7(e) is consistent with this recognition. It is a practical reality that recipients of federal funds sometimes respond to complaints about their treatment of a disabled child by retaliating against the disabled child, the initiator of the complaint (who is often a parent), or both. We hold, therefore, that Weber has standing to pursue her retaliation claim under Section 504. We now turn to the question of whether Weber must exhaust the administrative remedies provided by subchapter II of IDEA before filing a Section 504 retaliation claim in her individual capacity in federal court.[8]

**III.  IDEA Requirement of Exhaustion of Administrative Remedies**

---

[8]Weber brought her Count IV claim under Section 504 of the Rehabilitation Act and § 1983. Our analysis has focused on the Section 504 claim because that was the focus of Weber's appeal. Without addressing the merits of her § 1983 claim, which she describes as a claim intended "to enforce the anti-retaliation provision of IDEA," we note that any such claim will also be subject to the IDEA requirement of exhaustion of administrative remedies as a claim "seeking relief that is available under [IDEA]" if Weber has standing to bring her retaliation claim under IDEA.  20 U.S.C. § 1415 (*l*); N.B. v. Alachua County Sch. Bd., 84 F.3d 1376, 1379 (11th Cir. 1996); Mrs. W. v. Tirozzi, 832 F.2d 748, 756 (2d Cir. 1987).

The statutory provisions of subchapter II of IDEA are attentive to the details of administrative process. Section 1415(b)(6) requires states to provide the "opportunity to present complaints with respect to any matter relating to the identification, evaluation, or educational placement of the [disabled] child . . . ." The IDEA due process hearing provision, 20 U.S.C. § 1415(f)(1), mandates that parents who have filed a complaint under IDEA "shall have an opportunity for an impartial due process hearing . . . conducted by the State educational agency or by the local educational agency, as determined by State law or by the State educational agency." A party to an IDEA due process hearing has the right to present evidence, and to confront, cross-examine, and compel the attendance of witnesses; the right to be accompanied and advised by counsel and by individuals with special knowledge or training with respect to the problems of children with disabilities; the right to a written, or at the option of the parents, electronic verbatim record of such hearing; and the right to a written or, at the option of the parents, electronic findings of fact and decisions. See id. § 1415(h). The hearing officer may not be an employee of the state or local educational agency involved in the care or education of the disabled child. See id. § 1415(f)(3).

-18-

IDEA requires recourse to this due process hearing when plaintiffs seek relief available under subchapter II of IDEA even if the suit is brought pursuant to a different statute. See id. Section 1415(*l*) reads:

> Nothing in this chapter shall be construed to restrict or limit the rights, procedures, and remedies available under the Constitution, the Americans with Disabilities Act of 1990, title V of the Rehabilitation Act of 1973, or other Federal statutes protecting the rights of children and youth with disabilities, except that before the filing of a civil action under such laws seeking relief that is available under this subchapter, the procedures under subsections (f) and (g) of this section shall be exhausted to the same extent as would be required had the action been brought under this subchapter.[9]

Weber argues that she does not have to meet the IDEA exhaustion requirement because, as a parent, she does not have standing to file her own retaliation claim under IDEA, and hence the relief

---

[9]Congress amended the EHA (the predecessor statute to IDEA) in response to the Supreme Court's decision in Smith v. Robinson, 468 U.S. 992, 1012-13 (1984), holding that when EHA, section 504, and Equal Protection claims overlap, the EHA was the exclusive means for securing the provision of a free appropriate education. Congress added § 1415(*l*) to "reaffirm, in light of [Smith], the viability of section 504, 42 U.S.C. 1983, and other statutes as separate vehicles for ensuring the rights of handicapped children." H.R. Rep. No. 99-296, 99th Cong., 1st Sess. 4 (1985)(quoted in W.B. v. Matula, 67 F.3d 484, 494 (3d Cir. 1995)).

she seeks with her Section 504 claim is not available to her under IDEA.  We reject her standing argument.

Unlike the Rehabilitation Act, IDEA lacks a broad enforcement provision granting standing to "any person aggrieved" by violations of the Act, or an implementing regulation that protects any individual who has been intimidated, threatened, coerced or discriminated against because she made a complaint under the Act.  The issue confronting us, therefore, is whether there is a basis in the language and statutory framework of IDEA for Weber to file a retaliation claim in her individual capacity.  We first look to the basic principles of standing to determine whether Weber may file such a retaliation claim under IDEA.

Standing doctrine encompasses both constitutional and prudential requirements.[10]  The constitutional standing rules ensure the existence of a concrete "case or controversy" as

---

[10]There is some confusion as to how far ordinary standing principles apply to administrative proceedings.  See, e.g., Envirocare of Utah, Inc. v. Nuclear Regulatory Comm'n, 194 F.3d 72, 74 (D.C. Cir. 1999)(Agencies . . . are not constrained by Article III of the Constitution; nor are they governed by judially-created standing doctrines restricting access to the federal courts.  The criteria for establishing 'administrative standing' therefore may permissibly be less demanding than the criteria for 'judicial standing.'").  Since no one has argued that administrative proceedings under IDEA are subject to rules different than those that apply to courts, we put this possibility aside in the present case.

-20-

required by Article III: "[A]t an irreducible minimum, Art. III requires the party who invokes the court's authority to show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant, and that the injury fairly can be traced to the challenged action and is likely to be redressed by a favorable decision." Valley Forge Christian College v. Americans United for Separation of Church & State, Inc., 454 U.S. 464, 472 (1982)(internal quotation marks and citations omitted). Weber meets these constitutional requirements: the alleged retaliation resulted in "injury in fact" which can be redressed through the declaratory, injunctive, and monetary relief requested by Weber for all counts of her complaint.

In addition to the constitutional requirements, the standing inquiry encompasses prudential considerations aimed at preventing courts from adjudicating "questions of broad social import where no individual rights would be vindicated." Phillips Petroleum Co. v. Shutts, 472 U.S. 797, 804 (1985). To meet the prudential requirements, the plaintiff's challenge must rest on her own legal rights and interests, not the rights of third parties, see Warth v. Seldin, 422 U.S. 490, 499 (1975), and the harm asserted cannot be a "generalized grievance" shared in equal measure by all or a large class of citizens, id. The

claim must also fall within "the zone of interests to be protected or regulated by the statute or constitutional guarantee in question," Association of Data Processing Serv. Org., Inc. v. Camp, 397 U.S. 150, 153 (1970). The zone of interests test does not require "an indication of Congressional purpose to benefit the would-be plaintiff;" instead, the "proper inquiry is simply whether the interest sought to be protected by the complainant is arguably within the zone of interests to be protected . . . by the statute." National Credit Union Admin. v. First Nat'l Bank & Trust Co., 522 U.S. 479, 492 (1998) (internal quotation marks and citations omitted) (alteration and emphasis in original). Only this last element, the zone of interests, is at issue in this case.          As noted, we review the language and structure of IDEA to determine whether Weber's retaliation claim falls within the zone of interests protected by IDEA. That review reveals the central role played by parents in assuring that their disabled child receives a "free appropriate public education," 20 U.S.C. § 1400(d)(1)(A). The IDEA statement of purposes explicitly recognizes the statute's mission "to ensure that the rights of children with disabilities and parents of such children are protected." Id. § 1400(d)(1)(B)(emphasis added). The centerpiece of IDEA is the Individualized Education Plan, which describes the disabled

-22-

child's academic goals and special education services. The statute establishes an elaborate mechanism for parental involvement by designating parents as part of the Individualized Education Plan team, see id. § 1414(d)(1)(B)(i), requiring revision of the IEP to address information provided either by or to parents regarding the child's educational needs and services, see id. § 1414(d)(4)(A)(ii)(III), and mandating that parents must be "members of any group that makes decisions on the educational placement of their child," id. § 1414(f). In addition to extensive procedures for parental involvement in the Individualized Education Plan, IDEA also ensures the central role of parents by requiring parental consent to educational evaluations, see id. § 1414(a)(1)(c)(i) & (c)(3), assigning a surrogate parent to "protect the rights of the child" when the child's parents are not known or cannot be located, see 20 U.S.C. § 1415(b)(2), and mandating "an opportunity for the parents of a child with a disability to examine all records relating to such child," id. § 1415(b)(1). IDEA also authorizes the Secretary of Education to make grants to support "parent training and information centers" to help parents understand their child's disability, participate in decision-making processes and the development of individualized education programs, and utilize IDEA's procedural safeguards. See id. §

-23-

1482.  In sum, Weber's claim easily meets the "arguably within the zone of interests" standard, and she would have standing under IDEA to bring her retaliation complaint.

Furthermore, the IDEA complaint provision in subchapter II affords the "opportunity to present complaints with respect to <u>any</u> matter <u>relating to</u> the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to such child."  See <u>id.</u> § 1415(b)(6) (emphasis added).  Weber's claim of retaliation is literally "related" to the "identification, evaluation, or educational placement of [her] child," and to her efforts to gain for him "the provision of a free appropriate public education."  As Weber has completely failed to explain to us why she does not therefore have relief that is available through an IDEA due process hearing that must be exhausted, 20 U.S.C. § 1445(k), (*l*), we conclude that Weber had to invoke the due process hearing procedures of IDEA before filing her retaliation claim in federal court pursuant to Section 504 of the Rehabilitation Act and 42 U.S.C. § 1983.[11]

We are tempted to leave it at that.  For the sake of clarity and completeness, however, we note that the relief

_____

[11]Once the state due process procedures were completed, Weber could have included in her array of federal claims a cause of action under IDEA itself. <u>See</u> 20 U.S.C. § 1415(i)(2)(A).

available question might be a close one if Weber had presented any arguments on it. That is so because there are exceptions to the IDEA exhaustion requirement based on the concept of futility. A plaintiff does not have to exhaust administrative remedies if she can show that the agency's adoption of an unlawful general policy or practice would make resort to the agency futile, or that the administrative remedies afforded by subchapter II of IDEA are inadequate given the relief sought.[12] See Christopher W. v. Portsmouth Sch. Comm., 877 F.2d 1089, 1094 (1st Cir. 1989). This latter form of futility overlaps with the "relief available" language of § 1415(*l*) in the sense that relief is not available within the meaning of § 1415(*l*) if the due process hearing provided by subchapter II of IDEA does not provide relief that addresses the claim of the complainant. This conclusion follows from the logic of the exhaustion requirement set forth in § 1415(*l*). It would make no sense to require, in the language of § 1415(*l*), a party with a claim

---

[12]The legislative history indicates a particular concern with futility. Senator Williams, the principal author of the Education of the Handicapped Act, the predecessor statute to IDEA, stated that "exhaustion of the administrative procedures established under this part should not be required for any individual complainant filing a judicial action in cases where such exhaustion would be futile either as a legal or practical matter." 121 Cong. Rec. 37416 (1975)(quoted in Christopher W., 877 F.2d at 1094).

-25-

"under the Constitution, the Americans with Disabilities Act of 1990, title V of the Rehabilitation Act of 1973, or other Federal statutes protecting the rights of children and youth with disabilities" to first participate in an IDEA due process hearing if the relief available through such a hearing would not address the claim of the party.

The district court found that Weber did not meet any of the futility exceptions to the exhaustion requirement. On appeal, Weber does not challenge this conclusion despite the fact that the regulations regarding due process hearings under IDEA do not appear to read "related" broadly. Instead, they seem to provide for due process hearings that directly challenge proposals or decisions about the child's educational situation. See 34 C.F.R. §§ 300.503, 300.507; R.I. Code R. 08 010 002-47 (prior notice), -50 (Impartial due process hearing). In the face of these provisions, a hearing officer might refuse to consider a claim of retaliation like Weber's. Cf. Rockbridge County Public Schools, EHLR 401:248 (1987) (state review of hearing officer's decision holding that complaints about parent access to records and other procedural violations were outside the hearing officer's jurisdiction under Virginia regulations). The difficult issue in this case is not who has standing to

bring a complaint (the only issue that Weber raises), but rather what is the scope of the hearing provided.

Weber does not point to these regulations (or anything else) to establish that the relief she seeks is not available because the regulations limit the scope of the due process hearing provided by IDEA. Nor does she argue that pursuing a due process hearing would be unduly burdensome due to the school district's purportedly retaliatory tactics. Cf. Honig v. Doe, 484 U.S. 305, 326-27 (1988) (burden of demonstrating exception from exhaustion requirement on party seeking to avoid requirement); Christopher W. v. Portsmouth Sch. Comm., 877 F.2d 1089, 1095 (1st Cir. 1989) (exceptions to exhaustion requirement include cases in which further agency proceedings may be futile, and in which exhaustion will work severe harm upon a litigant). We refuse to construct these arguments for her, see e.g., Massachusetts School of Law at Andover v. American Bar Ass'n, 142 F.3d 26, 43 (1st Cir. 1998), and take no position on their merits.[13]

---

[13]Weber also failed to raise the argument on appeal that a due process hearing was futile, or that exhaustion was not required by the terms of § 1415(*l*), because she could not recover monetary damages through such a proceeding, despite a demand in her complaint for compensatory and punitive damages and an assertion in her complaint that she could not recover such damages through a due process hearing. The Third Circuit has held that "in a § 1983 action to enforce IDEA, . . . compensatory damages are available to remedy IDEA violations,"

-27-

In light of the arguments made, therefore, we must conclude that Weber had to comply with the exhaustion requirement of § 1415(*l*). Anticipating the possibility of this ruling, Weber suggests that she complied with this requirement through the numerous administrative complaints that she filed. This argument fails. Although Weber filed three CRP complaints with the Rhode Island Department of Elementary and Secondary Education, two complaints with the Office of Equity and Access, and participated in a mediation on the issue of declassification, she never initiated the due process hearing described in IDEA. IDEA's mandate is explicit: plaintiffs must

---

but "IDEA itself makes no mention of such relief. Hence by its plain terms § 1415(f) does not require exhaustion where the relief sought is unavailable in an administrative proceeding." W.B. v. Matula, 67 F.3d 484, 494, 496 (3d Cir. 1995). The Ninth Circuit held that a plaintiff seeking only monetary damages for violations of the Rehabilitation Act, the Americans with Disabilities Act, and 42 U.S.C. § 1983 did not have to comply with the exhaustion of administrative remedies requirement of IDEA because "under the IDEA, monetary damages are not available, so exhaustion is not required." Witte v. Clark County Sch. Dist., 197 F.3d 1271, 1275 (9th Cir. 1999). In Charlie F. v. Board of Educ. Of Skokie Sch. Dist. 68, 98 F.3d 989, 991 (7th Cir. 1996), the Seventh Circuit concluded "that damages are not 'relief that is available under' the IDEA," but nevertheless required exhaustion where plaintiff sought only monetary damages. The court held that "what relief is 'available' does not necessarily depend on what the aggrieved party wants." Id. at 991. We do not have to decide whether damages are available for a violation of IDEA, and the relationship of that determination to the exhaustion requirement of IDEA, because Weber never raised this exhaustion issue on appeal.

exhaust IDEA's impartial due process hearing procedures in order to bring a civil action under subchapter II of IDEA or any "such law[] seeking relief that is also available" under subchapter II of IDEA. 20 U.S.C. § 1415(*l*).

The case law confirms that state and federal complaint procedures other than the IDEA due process hearing do not suffice for exhaustion purposes. Even the CRP procedures (formerly known as EDGAR), which implement IDEA, are "not an adequate alternative to exhausting administrative remedies under IDEA." Association for Community Living in Colo. v. Romer, 992 F.2d 1040, 1043-44 (10th Cir. 1993)(analyzing the EDGAR provisions); Megan v. Independent Sch. Dist., 57 F. Supp. 2d 776, 790 (D. Minn. 1999)(reaching the same conclusion after the amendments that converted EDGAR into the CRP implementing regulations of IDEA).[14] In Christopher W. v. Portsmouth School Committee, 877 F.2d 1089, 1099 (1st Cir. 1989), we held that a plaintiff who had failed to pursue a due process hearing but had

---

[14]The rationale for the strict exhaustion requirement has been variously explained. In Christopher W. v. Portsmouth School Committee, 877 F.2d 1089, 1094 (1st Cir. 1989), we explained that exhaustion "enables the agency to develop a factual record, to apply its expertise to the problem, to exercise its discretion, and to correct its own mistakes, and is credited with promoting accuracy, efficiency, agency autonomy, and judicial economy."

filed an EDGAR complaint had not satisfactorily exhausted administrative remedies.

Therefore, based on the statutory language and case precedent, we conclude that Weber's complaints pursuant to the federal CRP and the Rhode Island complaint procedure did not fulfill the IDEA exhaustion requirement. The district court properly granted summary judgment to defendants on Count IV of Weber's complaint, and we affirm without prejudice as to any future action Weber might bring after satisfying the exhaustion requirement.

**Affirmed.  Each party shall bear its own costs**.