Greenland School District v. N.     CV-02-136-JD  03/18/03 P
UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW HAMPSHIRE


Greenland School District

     v.                              Civil No. 02-136-JD
                                     Opinion NO. 2003 DNH 043
Amy and Robert N., as next
friends of Katie C.


O R D E R


     Greenland School District seeks judicial review under the
Individuals with Disabilities Education Act ("IDEA"), 20
U.S.C. § 1415(i)(2), of the decision of the New Hampshire
Department of Education issued by a hearing officer on
February 20, 2002.  Amy and Robert N. are the parents of Katie
C., a learning disabled child.  The hearing officer concluded
that Greenland School District should have found Katie to be
eligible for special education services during the 1999-2000
school year and ordered the District to reimburse her parents
for the tuition they paid for Katie's private school during
the school year of 2001-2002 and the spring semester of 2001.
The District appeals that decision.

<u>Background</u>

Katie C. was born on March 5, 1990, and lives with her family in Greenland, New Hampshire. She attended grades one through four at Greenland Central School. While there, she was taught in regular classrooms by regular education teachers. She was never held back in a grade, and she received passing grades in all subjects. No one at the school ever referred Katie to be evaluated for special education, and her parents did not request evaluation while she was enrolled at the Greenland Central School.

Katie's mother is a special education teacher at Portsmouth High School, which is in the same school district as Greenland Central School. She has served as the liason between Greenland's middle school and Portsmouth High School for the transition of special education students. She has a professional relationship with Michelle Langa, the assistant superintendent for the supervisory administrative unit serving Greenland, and the special education staff.

In first grade, Katie had difficulty at times maintaining focus. Her first grade teacher used "classroom interventions" to help Katie and discussed her "distractibility" with her parents. Jt. St. of Facts at 9. On her report card, her teacher noted that Katie usually performed well but had a hard

time finishing her own work. Between first and second grade, Katie's parents had her evaluated by a psychologist, Dr. Dawson, who diagnosed Attention Deficit Hyperactivity Disorder ("ADHD"). Dr. Dawson recommended environmental modifications for instruction, behavior management strategies, and medication. Katie's pediatrician prescribed Ritalin and substituted Adderall in April of 1998.

In second grade, Katie was grouped with students having better reading skills but needed extra support in math. She exhibited some organizational issues and had difficulty staying on task. Her teacher used behavior modification techniques which she routinely used with her students in the classroom. Katie received passing grades in all subjects. At the end of second grade, in June of 1998, Katie took the California Achievement Test. Her scores were in the average to above average range except language mechanics where she ranked at grade 9.7.

Katie's third grade teacher also used intervention techniques to help Katie stay on task. For example, she used Garfield stickers as an incentive. Katie's grades were above average. She achieved a "basic" score on a standardized test for third graders. Her teacher noted that Katie could perform very well when she focused on her work. Her teacher also

noted that Katie's only behavior issues occurred when her father picked her up at the end of the day.

In fourth grade, Katie's teacher moved her desk to the front of the classroom to offset her distractibility. She had difficulty completing her work, following instructions, and keeping on task. Without the help of her parents and an out-of-school tutor, Katie would not have been able to complete her work. Her teacher had students work in pairs to learn to work together. Katie did well with some partners and had difficulty with others. Her teacher found that Katie was hypersensitive and would personalize things that happened in the classroom. He also noted that she displayed negative conduct toward her father at the end of the day. She earned above average grades. She achieved average and above average scores on the California Achievement Test at the end of the year.

Before Katie entered fifth grade in 2000, her parents removed her from the public school and enrolled her at Mont Blanc Academy. The new school asked Katie's mother not to help her with her homework. Katie received a failing grade in math that fall. Thereafter, her mother resumed helping her with homework, and Katie's grades rose to all As and Bs. Mont Blanc asked Katie's parents to withdraw her from the school,

but no reason is provided in the parties' factual statement.

Katie was enrolled at Learning Skills Academy in March of 2001 to complete fifth grade. Learning Skills Academy is a private special education school that serves children with learning disabilities and ADHD. Katie is still a student at Learning Skills Academy.

Also in March of 2001, Katie's mother, Mrs. N., asked about having Dr. Secor, a neuropsychologist on contract with the Greenland and Portsmouth schools, test Katie. A meeting was scheduled to be held on April 6, 2001, about Mrs. N.'s request for a referral. Three District special education specialists, two representatives from Learning Skills Academy, a learning disabilities teacher, and a program coordinator attended the meeting. The team concluded that it lacked sufficient information to determine whether Katie should be coded as learning disabled. They recommended that Katie's parents agree to have her evaluated. The team members and Mrs. N. agreed on which evaluations should be done.

Katie's evaluations were done in April and May of 2001. Dr. Secor administered fourteen tests and interviewed Katie. The parties disagree as to the meaning of the results. In his conclusion, Dr. Secor wrote that Katie is an intelligent young girl whose performance is limited by weakness in "skills

associated with executive functioning." SD at 44. He also wrote that Katie's deficits in functioning skills "profoundly interact with the press of dsyphoric emotion she experiences to color her affective world and influence her thinking (especially when dealing with people)." Id. He found it unsurprising that Katie had experienced teasing and had felt harassed by other students in public school because of her limited cognitive flexibility and vulnerability to emotion. Dr. Secor concluded that Katie's "social fears and feelings of vulnerability made her particularly susceptible to intense feeling[s] of anxiety which interfere with her ideational and behavioral control." SD 45. Katie also took a variety of achievement tests administered by the Learning Skills Academy and the District. She generally achieved average results on the tests.

The District convened an evaluation team meeting on May 23, 2001, to review the results of the tests and assessments. The consensus of the team was that although Katie had ADHD and an anxiety disorder, which caused some functioning deficits, her limitations did not adversely affect her academic performance. The team ruled out a learning disability due to the lack of discrepancy between Katie's test scores and her performance. The school officials in the group concluded that

Katie did not require special education services. Katie's mother did not sign the team summary which included the determination that Katie did not qualify for special education. The team offered to design a "504 plan" for Katie "to address some organizational weaknesses and to offer additional classroom strategies to assist Katie in improving her organizational skills." Jt. St. of Facts at 25.

Mrs. N. told Michelle Langa, the Assistant Superintendent, that she was going to pursue an independent evaluation for Katie. On May 29, 2001, Mr. and Mrs. N. sent Michelle Langa a letter informing her that they disagreed with the District's decision that Katie was not eligible for special education.

Dr. Ilene Spitzer, a physician specializing in psychiatry, met Katie in May of 2001. On August 15, 2001, Dr. Spitzer sent the District a letter in which she confirmed the prior diagnosis of ADHD but also added the diagnosis of Asperger's Syndrome. Dr. Spitzer found that Katie has "language based deficits that include deficits in social pragmatics." Jt. St. Facts at 29. Dr. Spitzer also changed Katie's medication. Assistant Superintendent Langa knew that the diagnosis of Asperger's Syndrome was serious and advised the Greenland Central School principal that the District would

7

need to have another evaluation meeting.

On September 12, 2001, the District held another meeting of the evaluation team to reconsider Katie's eligibility for special education in light of Dr. Spitzer's diagnosis. Dr. Spitzer attended the meeting. Dr. Secor and Dr. Spitzer strongly disagreed as to Katie's diagnosis. Although the team did not believe that Katie was then showing any adverse educational performance, they were concerned about the future impact of Asperger's Syndrome. Assistant Superintendent Langa agreed to code Katie for special education. The team decided not to code Katie as "autistic," because of their concerns about that label, and instead coded her as "other health impaired," based on her diagnoses of ADHD, anxiety disorder, and Asperger's Syndrome.

The meeting to develop an "individualized education program" ("IEP") for Katie was held on November 2, 2001. The District then had three additional team meetings before finalizing an initial IEP for Katie on December 5, 2001. The IEP was based on Katie returning to the Greenland schools. Mrs. N. agreed with the goals and plans in the IEP except for placement in the Greenland schools. She did not think that Katie would feel safe in the Greenland schools because of her reactions to past teasing and harassment, and wanted her to

stay in the Learning Skills Academy.  The Learning Skills Academy has served students with Asperger's Syndrome in the past but does not have special expertise in that area.  Mrs. N. believes that Katie is doing wonderfully at the Academy and notes that her recent report card was her best, that Katie has friends, and that she does not have the anxiety that she used to have.

In the meantime, Mr. and Mrs. N. filed a request for a due process hearing on November 15, 2001.  In their letter requesting the hearing, Katie's parents stated that they appreciated the school's efforts in working with them to draft an IEP for Katie.  They explained that they were seeking a due process hearing to address reimbursement for Katie's tuition at the Learning Skills Academy and that they were concerned that the time allowed by law for a hearing would run out.

A prehearing conference was held by the hearing officer on January 15, 2002.  The District raised several grounds to dismiss the parents' request for a due process hearing.  The hearing officer fixed the date of November 15, 2001, as the last date of actions that would be considered at the hearing. The parents expressed some disagreement with the District's IEP and also stated that they were challenging the District's failure to identify Katie as eligible for special education in

9

May of 2001.  The District filed a second motion to dismiss on January 16, the day after the prehearing conference.  The parents filed objections to the District's motions to dismiss.

The due process hearing was held on January 28, 29, and 31, 2002.  During the course of the hearing, the following witnesses testified:  Katie's mother, Katie's teachers at Greenland Central School and the principal, the special education coordinator in Greenland, a District learning disabilities teacher, two District special education teachers, the assistant superintendent, the program coordinator at Learning Skills Academy, a speech/language pathologist from Massachusetts General Hospital, and a District speech/language pathologist.

The hearing officer issued his decision on February 20, 2002.  He denied the District's motions to dismiss.  He concluded that the District should have found that Katie was eligible for special education services for the 1999-2000 school year and had sufficient information to code her in May of 2001.  The decision ordered the District to reimburse Katie's parents for her tuition at the Learning Skills Academy for the spring semester of 2001 and for the 2001-02 school year.  The District filed its complaint seeking judicial review of the decision on March 25, 2002.

Discussion

A hearing officer's factual findings are reviewed under an intermediate standard which "'requires a more critical appraisal of the agency determination than clear-error review entails, but which, nevertheless, falls well short of complete de novo review.'" Rafferty v. Cranston Pub. Sch. Comm., 315 F.3d 21, 25 (1st Cir. 2002) (quoting Lenn v. Portland Sch. Comm., 998 F.2d 1083, 1086 (1st Cir. 1993)). In contrast, a purely legal question is reviewed de novo. See Manchester Sch. Dist. v. Crisman, 306 F.3d 1, 9 (1st Cir. 2002). The burden of proof rests with the party challenging the agency decision, which is the District in this case. See Hampton Sch. Dist. v. Dobrowolski, 976 F.2d 48, 54 (1st Cir. 1992).

The District raises nine issues on appeal. The issues are stated somewhat differently in the issue statement section of the District's memorandum and in the individual headings in the discussion section. In general terms, the District contends that the hearing officer erred in finding that the District violated the IDEA by failing to code Katie before September of 2001, that the IEP developed by the District was inadequate and could not be implemented by the District, and in awarding the parents reimbursement for tuition and for the independent evaluation. The District also contends that the

Hearing Officer erred in accepting jurisdiction to consider the adequacy of the District's proposed IEP because of Katie's placement in private school.

The IDEA "was enacted, in part, 'to assure that all children with disabilities have available to them . . . a free appropriate public education which emphasizes special education and related services designed to meet their unique needs.'" Cedar Rapids Cmty. Sch. Dist. v. Garret F., 526 U.S. 66, 68 (1999) (quoting 20 U.S.C. § 1400(d)(1)(A) (formerly § 1400(c))). Participating states, such as New Hampshire, receive federal financial assistance for IDEA mandated services. See id.; see also Murphy v. Timberlane Reg'l Sch. Dist., 22 F.3d 1186, 1188 at n.2 (1st Cir. 1994). New Hampshire, therefore, "must assure all learning disabled children the right to a "free appropriate public education," 20 U.S.C. § 1400(d)(1)(A), by providing "access to specialized instruction and related services . . . individually designed to provide educational benefit to the handicapped child,' Bd. of Educ. v. Rowley, 458 U.S. 176, 201 (1982).'" Rome Sch. Comm. v. Mrs. B., 247 F.3d 29, 32 (1st Cir. 2001); see also Irving Indep. Sch. Dist. v. Tatro, 468 U.S. 883, 891 n.8 (1984) (construing predecessor to IDEA, Education of the Handicapped Act).

12

A.  Effect of Katie's Enrollment in Private School

The IDEA imposes a "child find" obligation on each participating state to implement policies and procedures to identify, locate, and evaluate all children with disabilities who are in need of special education and related services. 20 U.S.C. § 1412(a)(3); 34 C.F.R. § 300.125(a). The "child find" obligation is not limited to children attending public schools, but instead also extends to children attending private schools. See id. Once a child is identified with a disability, however, the IDEA imposes different obligations on the local school districts depending on whether the child is enrolled in public or private school. See Gary & Silvie S. v. Manchester Sch. Dist., 2003 WL 134999, at *2 (D.N.H. Jan. 16, 2003) (applying 20 U.S.C. § 1412(a)(10)(C)(i)). In addition, the IDEA exhaustion requirements operate differently depending on the circumstances of the child's enrollment in private school. See 20 U.S.C. § 1415(b); 34 C.F.R. § 300.457; see also Steward v. Hillsboro Sch. Dist., 2001 WL 34047100, at *2 (D. Or. Mar. 1, 2001).

When a child with a disability receives special education and related services in a public school but the parents dispute whether the school is providing a "free appropriate

13

public education" ("FAPE") and enroll the child in private school, the district will not be required to pay the costs as long as the district made FAPE available to the child.  See 20 U.S.C. § 1412(a)(1); 34 C.F.R. § 300.403(a).  Before parents remove a child from public school when FAPE is at issue, they must give proper notice to the school.  See 20 U.S.C. § 1412(10)(C)(iii).  Complaints about whether the district made FAPE available and about reimbursement for the costs of private education are subject to due process procedures.  20 U.S.C. § 1415(f); 34 C.F.R. § 300.403(b) & (c).

A child who is enrolled in a private school by her parents, when the child has not received special education and when FAPE is not an issue in the public school, is still subject to the "child find" requirements for identifying children with disabilities.  20 U.S.C. § 1412(a)(10)(A)(ii); 34 C.F.R. § 300.451.  Disputes about the identification of a private school child as a child with a disability are subject to due process procedures.  20 U.S.C. § 1415(f); 34 C.F.R. § 300.457(b).  When a private school child is identified as a child with a disability, the district must develop and implement a "services plan."  Id. at § 300.452; Gary S., 2003 WL 134999, at *3 (citing N.H. Admin. Code Ed. 1117.03).  The expenditures necessary to implement a services plan are

14

provided in 34 C.F.R. § 300.453. However, "[n]o private school child with a disability has an individual right to receive some or all of the special education and related services that the child would receive if enrolled in a public school." 34 C.F.R. § 300.454(a). Therefore, due process procedures do not apply to complaints that a district has failed to provide adequate services for a private school child, which complaints must be addressed under the complaint process provided by the state. 34 C.F.R. § 300.457(a); Gary S., 2003 WL 134999, at *2-3.

In this case, Katie was enrolled in private school, the Mont Blanc Academy, before she was identified as a child with a disability and before her parents raised any issue as to FAPE. Cf. Rafferty, 315 F.3d at 26 (discussing private school placement of disabled child previously enrolled in public school with IEP); James v. Upper Arlington City Sch. Dist., 228 F.3d 764, 766-69 (6th Cir. 2000) (discussing district's obligation to prepare IEP for private school child previously enrolled in public school with IEP); Amann v. Stow Sch. Sys., 982 F.2d 644, 651-52 (1st Cir. 1992) (same). Therefore, FAPE was not at issue when Katie left public school. Katie's parents did not give notice to the District that they were enrolling her in private school. In fact, Katie's parents

15

were not seeking special education services when they enrolled Katie at Mont Blanc Academy. Katie's mother only requested that Katie be evaluated after she was enrolled in private school, and then only after her experience at Mont Blanc Academy was unsuccessful.

While she was enrolled in private school, Katie was subject to the "child find" process. Once she was identified as disabled, however, she was not entitled to the same services that she would have been had she been enrolled in public school. As a result, her parents' complaints relating to the services to be provided by the District should have been brought through the state complaint process, not through the due process procedure. The IDEA requires an aggrieved party to exhaust administrative remedies under the procedures provided. 20 U.S.C. § 1415(l); Frazier v. Fairhaven Sch. Com., 276 F.3d 52, 59 (1st Cir. 2002). The hearing officer erred in considering Katie's parents' complaint about the adequacy of the services the District proposed for Katie in the IEP and their request that the District reimburse them for the costs of her private school tuition.[1] See Gary S., 2003

---

[1]The District raises an issue as to whether the parents had standing to bring their claims to a due process hearing. It appears that they did not as to the claim challenging the sufficiency of the services the District proposed, and that

WL 134999, at *3. The Hearing Officer also erred in using the standard applicable to a child in public school as to the parents' complaints.[2] Therefore, that part of the decision that found the District's proposed IEP was inadequate and that required the District to reimburse Katie's parents for the cost of private school for the spring semester of 2001 and for the school year of 2001-2002 is vacated.

B.   Identification and Coding - "Child Find"[3]

The hearing officer held that the District should have

_____

they failed to use the proper administrative procedure to address that claim. Although the IDEA imposes an exhaustion requirement that implicates this court's subject matter jurisdiction, exceptions also exist to the exhaustion requirement. See, e.g., Taylor v. Vt. Dep't of Educ., 313 F.3d 768, 789 (2d Cir. 2002); Weber v. Cranston Sch. Comm., 212 F.3d 41, 49 (1st Cir. 2000). Here, where the parents' claims were presented, considered, and decided in the administrative context, albeit the wrong forum, the parents are deemed to have exhausted their claims for purposes of judicial review.

[2]The Hearing Officer appears to fault the District's proposed IEP in part because the District had not hired an aide, who would be required to implement the IEP if Katie were to return to a District school. It would be unusual to require a District to hire personnel to provide services at a school for a child who is not enrolled there.

[3]Complaints that a school district has failed to comply with the requirements of "child find" are subject to the due process procedures. 34 C.F.R. § 300.457(b).

identified Katie as a child with a disability in fourth grade, which was the school year of 1999 to 2000. Katie's parents, however, only challenged the District's failure to code Katie as of the May 23, 2001, decision on their referral request. The Hearing Officer also found that the District had sufficient information to code her at that time.

The IDEA defines a "child with a disability" as one:

> (i) with mental retardation, hearing impairments (including deafness), speech or language impairments, visual impairments (including blindness), serious emotional disturbance . . ., orthopedic impairments, autism, traumatic brain injury, other health impairments, or specific learning disabilities; and

> (ii) who, by reason thereof, needs special education and related services.

20 U.S.C. § 1401(3)(A); see also 34 C.F.R. § 300.7. Included within "other health impairments" is a condition of "having limited . . . alertness, including a heightened alertness to environmental stimuli, that results in limited alertness with respect to the educational environment that (i) Is due to . . . attention deficit disorder or attention deficit hyperactivity disorder . . . and (ii) Adversely affects a child's educational performance." 34 C.F.R. § 300.7(c)(9).

The New Hampshire Department of Education regulations require a local school district to "contact representatives of

18

private school children within its jurisdiction to advise them of the [district's] responsibility to identify and evaluate all children who are suspected of or known to be children with a disability and who are enrolled in such schools. . . ." N.H. Code Admin. Rule Ed. 1103.02(c). The regulations also permit anyone to refer a child under the age of twenty-two for evaluation and list four possible, but not exclusive, reasons for referral. Id. Ed. 1103.02(b). Once a child is referred, the school district must conduct the evaluation and determination under the standards provided by state and federal regulations. Id. Ed. 1107.01-03.

Although Katie C. was diagnosed with ADHD, a condition included within § 1401(3)(A) as constituting an "other health impairment," after first grade, she was not referred for evaluation until the spring of her fifth grade year, April of 2001. After considering the results of the evaluation and Katie's average and above average performance in her class work and on standardized tests, the IEP team concluded that Katie did not need special education because her educational performance was not adversely affected by ADHD.

Neither the IDEA nor federal regulations define "adversely affects a child's educational performance" within the meaning of § 300.7. Cf. J.D. ex rel. J.D. v. Pawlet Sch.

Dist., 224 F.3d 60, 66-68 (2d Cir. 2000) (discussing definition under Vermont Department of Education Rules). Despite the District's argument to the contrary, the New Hampshire Department of Education Regulations do not define the term.[4] The federal regulations, incorporated by the New Hampshire Department of Education, require that a disability determination be made based on "information from a variety of sources, including aptitude and achievement tests, parent input, teacher recommendations, physical condition, social or cultural background, and adaptive behavior," suggesting that grades and test results alone are not the proper measure of a child's educational performance. 34 C.F.R. § 300.535(a)(1); N.H. Code. Admin. R. Ed. 1107.01. Courts, including this court, have interpreted the adverse effect requirement to be satisfied if the child's educational performance would have

---

[4]N.H. Admin. Rule Ed. 1107.02(c), cited by the District, provides as part of the process for providing a "free and appropriate education" under the IDEA that after a child is referred for evaluation, the IEP team must determine whether the concerns about the child can be "addressed utilizing pupil support services available to all children, whether additional information is required, and what testing, if any, is needed to address any unresolved concerns raised by the referral." The rule does not define "[a]dversely affects a child's educational performance" for purposes of 34 C.F.R. § 300.7 and does not appear to mean that if generally available services will meet a child's needs, the child will not be considered disabled under § 300.7.

20

been adversely affected but for specialized instruction that the child was receiving. See, e.g., Weixel v. Bd. of Educ., 287 F.3d 138, 150 (2d Cir. 2002); Yankton Sch. Dist. v. Schramm, 93 F.3d 1369, 1375 (8th Cir. 1996); Kevin T. v. Merrimack Valley Sch. Dist., Civil No. 96-485-B, at 25 (D.N.H. Mar. 5, 1998).

Based on the Hearing Officer's findings, which are supported by the record, Katie was able to perform at average and above average educational levels because she was receiving individualized and personalized instruction. While she was in public school, her classroom teachers modified her environment and her assignments based on the effects of ADHD on her performance. Her mother provided individualized instruction at home, and in fourth grade her parents provided a tutor for Katie. When Katie's mother stopped providing special help in math while Katie was enrolled at the Mont Blanc Academy during the first semester of fifth grade, her math grade fell to failing. During the second semester of fifth grade, Katie received special education at the Learning Skills Academy. Therefore, because Katie's educational performance would have been adversely affected by ADHD but for the specialized instruction she was receiving, she met the requirements to be identified as a child with a disability by May 23, 2001.

The Hearing Officer's decision is affirmed to the extent it found that Katie should have been identified as a child with a disability on May 23, 2001. The remedy, however, reimbursement for the cost of Katie's tuition at the Learning Skills Academy, is not appropriate as is discussed above. Since Katie's parents do not appear to seek any other form of relief, none is considered.

### Conclusion

For the foregoing reasons, the decision of the New Hampshire Department of Education is vacated as to the adequacy of the proposed IEP and reimbursement of private school expenses. The decision is affirmed as to the lack of timeliness of the Greenland School District's identification of Katie as a child with a disability under its "child find" obligation, except for the remedy of reimbursement. Given the nature of this decision, an award of attorneys' fees pursuant to 20 U.S.C. § 1412(i)(3)(B) is not appropriate.

The clerk of court shall enter judgment accordingly and close the case.

SO ORDERED.

_____
Joseph A. DiClerico, Jr.
United States District Judge

22

March 19, 2003

cc:  Jeanne M. Kincaid, Esquire
     Scott F. Johnson, Esquire