**In the Matter of Victoria Rachel EADS, a minor, By and Through her parents and next friends, Chris EADS and Suzie Eads, and Chris Eads and Suzie Eads on their own behalf, Plaintiffs,**

v.

**UNIFIED SCHOOL DISTRICT NO. 289, FRANKLIN COUNTY, KANSAS, and The Board of Education, individually and in their official capacities, and Randall Renaud, Jack Dressler, Betty Gates, Bill Oshel, Barbara Oshel, Mike Trendal, David White, Madlyn Adams, Charles Rutledge, Joyce White, Barbara Kessler, and Corrine Gay, as employees of said school district, Defendants.**

No. 00–4010–SAC.

United States District Court, D. Kansas.

Jan. 4, 2002.

Fred W. Rauch, Jr., Fred W. Rauch, Jr., Chtd., Topeka, KS, for Plaintiffs.

A. J. Wachter, William B. Wachter, Wilbert & Towner, P.A., Pittsburg, KS, Robert L. Bezek, Jr., Bezek, Lowry & Hendrix, Ottawa, KS, Donald C. Bollard, III, Sherman, Taff & Bangert, P.C., Overland Park, KS, R. Michael Steele, Kansas City, MO, for Defendants.

## MEMORANDUM AND ORDER

CROW, Senior District Judge.

The case comes before the court on the motion for summary judgment or in the alternative to dismiss (Dk.14) filed by the defendants' Betty Gates, Bill Oshel, Barbara Oshel, Mike Trendal, David White, Madlyn Adams, Charles Rutledge, Joyce White, Jack Dressler and Corrine Gay, and the motions for summary judgment (Dks. 34 and 37) filed by all defendants.[1] The plaintiffs have filed a motion to amend the pretrial order to include a claim for improperly distributing the minor's edu-

---

1. Because the defendants' pending motions are cumulative in nature, the court will ad- dress them as a group.

cational records in violation of the Family Educational Right to Privacy Act ("FER-PA") 20 U.S.C. § 1232(g). (Dk.52). The plaintiffs also have moved the court for oral argument on the defendants' motions for summary judgment. (Dk.53). The court denies the request for oral argument, as the parties have fully briefed the issues and oral argument is unlikely to assist the court.

As plainly stated in the amended final pretrial order, "[t]his is an educational discrimination case under the Americans [Individuals] with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400, *et seq.*, and the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq.*" (Dk.44, p. 3). This action was brought on behalf of Rachel Eads, a seventh grade female student with juvenile diabetes. The plaintiffs allege the defendants failed to recognize that Rachel was a handicapped student by reason of her juvenile diabetes and to accommodate her accordingly. Specifically, the plaintiffs allege the defendants denied Rachel additional time to complete her class assignments, denied her homework in order to keep up with fellow students, ridiculed her before other students because of her disability, and displayed open animosity towards her. This environment contributed to the Rachel's inability to perform adequately at school and resulted in her forced withdrawal from public school.

## SUMMARY JUDGMENT STANDARDS

A court grants a motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure if a genuine issue of material fact does not exist and if the movant is entitled to judgment as a matter of law. The court is to determine "whether there is the need for a trial-whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either par-

ty." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will ... preclude summary judgment." *Id.* There are no genuine issues for trial if the record taken as a whole would not persuade a rational trier of fact to find for the nonmoving party. *Matsushita Elec. Indust. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "[T]here are cases where the evidence is so weak that the case does not raise a genuine issue of fact." *Burnette v. Dow Chemical Co.*, 849 F.2d 1269, 1273 (10th Cir.1988).

The initial burden is with the movant to "point to those portions of the record that demonstrate an absence of a genuine issue of material fact given the relevant substantive law." *Thomas v. Wichita Coca–Cola Bottling Co.*, 968 F.2d 1022, 1024 (10th Cir.), *cert. denied*, 506 U.S. 1013, 113 S.Ct. 635, 121 L.Ed.2d 566 (1992). If this burden is met, the nonmovant must " 'set forth specific facts' that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant." *Adler v. Wal–Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998). (citations omitted). "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Id.* The nonmovant's burden is more than a simple showing of "some metaphysical doubt as to the material facts," *Matsushita*, 475 U.S. at 586, 106 S.Ct. 1348. The court views the evidence of record and draws all reasonable inferences in the light most favorable to the nonmovant. *Thomas v. International Business Machines*, 48 F.3d 478, 484 (10th Cir.1995) (quoting *Bacchus Industries, Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir.1991)). "All material facts set forth in the statement of the movant shall be deemed admitted for

the purpose of summary judgment *unless specifically controverted* by the statement of the opposing party." *Vasquez v. Ybarra,* 150 F.Supp.2d 1157, 1160 (D.Kan.2001) (citing *See Gullickson v. Southwest Airlines Pilots' Ass'n,* 87 F.3d 1176, 1183 (10th Cir.1996) (applying local rules of District of Utah)); *see also* D.Kan. Rule 56.1(b)(1).

A party relying on only conclusory allegations cannot defeat a properly supported motion for summary judgment. *White v. York Intern. Corp.,* 45 F.3d 357, 363 (10th Cir.1995). "It is well settled in this circuit that we can consider only admissible evidence in reviewing an order granting summary judgment." *Gross v. Burggraf Constr. Co.,* 53 F.3d 1531, 1541 (10th Cir. 1995). It is not the form of the evidence that is dispositive, but rather "the content or substance of the evidence must be admissible." *Thomas,* 48 F.3d at 485.

More than a "disfavored procedural shortcut," summary judgment is an important procedure "designed 'to secure the just, speedy and inexpensive determination of every action.' Fed.R.Civ.P. 1." *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). At the same time, a summary judgment motion does not empower a court to act as the jury and determine witness credibility, weigh the evidence, or choose between competing inferences. *Windon Third Oil and Gas v. Federal Deposit Ins.,* 805 F.2d 342, 346 (10th Cir.1986), *cert. denied,* 480 U.S. 947, 107 S.Ct. 1605, 94 L.Ed.2d 791 (1987).

## STATEMENT OF UNCONTROVERTED FACTS[2]

1. At the time this action was filed in January of 2000, the plaintiff Victoria Rachel Eads ("Rachel") was a fourteen-year old female child. Rachel received educational services from Unified School District No. 289, ("District"), Franklin County, when she was twelve-years old and younger. Her parents are Suzie and Chris Eads.

2. Within an hour after receiving a telephone call on September 3, 1997, from the school nurse that her daughter might be diabetic, Suzie Eads sought medical care for her daughter, Rachel Eads. Rachel was hospitalized for approximately seven days beginning on September 3, 1997. Following her release from the hospital, Rachel remained at home for over one month.

3. Prior to Rachel's return to school on October 18, 1997, Rachel's parents met with Rachel's teachers and Randall Renaud, the District's principal of the Wellsville Junior/Senior High School.

4. Corrine Gray, the school nurse, prepared an "Individual Health Care Plan" for Rachel Eads that was dated October 14, 1997. The plan addresses the special health care needs in managing Rachel's diabetes mellitus. The plan discusses her dietary needs, blood glucose monitoring procedure and recording, the management of Rachel when she was hypoglycemic, the management of insulin, and other considerations regarding special treats, field

---

**2.** The following statement reflects the court's application of the procedural rules governing summary judgment proceedings. For example, the court treated defendants' statement as uncontroverted and/or admitted when the plaintiffs failed to controvert the statement with specificity, failed to identify the defendants' statement being controverted, or failed to refer with particularity to those portions of the record on which they were relying. *See* D.Kan. Rule 56.1(a), (b). The court's task in determining the uncontroverted facts was complicated by the parties' failure to organize their statements of fact, to give complete and accurate record citations, and to comply with the summary judgment rules.

trips, service providers and disposal of used sharps.

5. When she returned to school, Rachel went to the nurse's office to check her own blood sugar levels and to administer her own insulin shots. If the test revealed high blood sugar levels, then she would call her mother or try relaxing. If the test revealed low levels, she would drink some juice or eat a snack. The testing of her blood sugar levels required Rachel to leave some of her classes early and arrive late to others.

6. Rachel attended only fourteen days of school during the first quarter of 1997.

7. By letter dated December 15, 1997, Chris and Suzie Eads requested a Section 504 Plan of Accommodation for Rachel. The 504 proposal letter first requested the modification of "assignments and tests" in that Rachel's grades for the first and second quarters would be based on the work that she had completed and had been graded to date. As addressed first in the letter and explained later by Suzie Eads in her deposition, Rachel was still doing homework on school assignments she had missed because of her seven-week absence occurring two months ago. In the letter, Rachel's parents complained that certain teachers had not sent homework to Rachel during her absence even though the parents had made this request. "Homework given 5 to 6 weeks (math and english) after the fact shows a lack of caring and poor responsibility on the part of the teacher." (Dk.35, Doc. 11).

8. The Eads' 504 proposal letter next requested a modification of physical exercise ("P.E.") classes in that she would not write reports for missed activities but she would dress out for class so long as her blood sugar was not over 240 and so long as she ate a snack before exercise when her blood sugar was below 90.

9. The Eads' 504 proposal letter next requested medical accommodations that complied with the plan already written and on file with the school nurse, Mrs. Gray. This letter emphasized that "[r]egular testing is a very important part of diabetes care" and that this testing necessitated Rachel's lateness to or absence from class. *Id.* With regards to medical accommodations, Suzie Eads believed the plan was "essentially being followed except that" a teacher was causing some problems for Rachel. (Dk. 48, Suzie Eads Dep. p. 58).

10. In reaction to the Eads' 504 proposal, the 504 committee met and decided on a plan. Accompanied by a letter dated December 23, 1997, the plaintiffs were informed of the committee's proposed 504 plan.

11. In compliance with this plan, Rachel's treating physician provided a letter stating: "Rachel is on an insulin regimen that requires taking insulin three times a day, checking blood sugars four to six times a day and following a prescribed meal plan that includes planned snacks." (Dk. 35, Suzie Eads Dep. Ex. 1, Doc. 18). The letter detailed the times when blood sugar testing was necessary.

12. Following receipt of the 504 plan, Chris Eads spoke with Donovan Williams, Superintendent of the District, and requested a meeting with the 504 committee in order to discuss his differences of opinion with the committee's plan.

13. On January 16 and 27, 1998, Chris and Suzie Eads met with the 504 Committee and signed off on a Section 504 Student Accommodation Plan as of January 27, 1998. They agreed that Rachel would receive the services detailed in the plan with the exception of the assignment substitution regarding P.E. addressed in ¶ 5A. This plan addressed accommodations for receiving assignments during multiple day absences, maintaining weekly assignment books, taking make-up tests, testing blood sugar levels, and for receiving alternative

assignments for her performance classes like Band, P.E., Art and English.

14. The Eads received a report card dated February 10, 1998, that reported Rachel's grades for the first two quarters of the school year. The report card showed semester grades of an A in English, an A in Social Studies, a C in Band (C for first quarter and B+ for second quarter), A's and B's in Math and Science, and a C in Art (D for first quarter and C+ for second quarter). As of February 10, 1998, Rachel had completed all of her homework that she had missed, and her grades had been adjusted to reflect the same.

15. Chris Eads received a letter dated February 12, 1998, from Rachel's Band teacher, David White, that had been written apparently in response to a conference between Mr. Eads and Mr. White held that same day regarding Rachel's grade in Band. In that letter, Mr. White explained that he had arrived at the C grade for the first quarter after adding ten points based on Rachel's past history in Band which brought her grade up from a D to a C. In addition, Mr. White wrote:

> Since you seem so unhappy with the way I have tried to help Rachel rebound from the situation she was in, I will go back and report Rachel's grade as the D that she actually earned and I will no longer do anything that is not strictly defined in my grading policy. After all, I would not want to do anything to reflect anything other than the plain truth. Should you wish to reconsider your position you may feel free to let Mr. Renoud know that you wish her grade to stand as it is.
> If I hear nothing from Mr. Renoud by February 25th I will have her grade changed to reflect her efforts and not to show any influence by myself as to her past practice. With this letter I consider the matter closed. I want to point

out that we discussed that Rachel has already missed enough class that unless she does more makeup work she will not earn an A for this nine weeks at this point the best she can earn is a B. I wish to remind you that it is Rachel's responsibility as it is with all of my students to request makeup work. If she chooses not to do so at all or not to request in a timely manner she must live with the consequences of her choice.

(Dk. 35, Suzie Eads Dep. Ex. 1, Doc. 42).

16. On February 16, 1998, Rachel's parents presented the District with a form withdrawing Rachel from Wellsville Junior/Senior High School for home schooling. Around the same time, Rachel's parents wrote the District Superintendent Williams requesting a Due Process Hearing.

17. Rachel's parents received a letter dated February 26, 1998, from the District's attorney, notifying them of a Due Process Hearing scheduled for March 10, 1998, before Hearing Officer Sue Devoe. The hearing was held as scheduled with Rachel's parents, the 504 committee, the district lawyer and the investigator in attendance.

18. The Hearing Officer issued a twenty-one page decision that denied the Eads' request for the District to pay Rachel's tuition and transportation to attend the Baldwin School District. The Hearing Officer concluded that the District failed to properly implement the provisions of § 504 of the Rehabilitation Act by not promptly convening the 504 committee to evaluate Rachel's "diabetic absences and determine if an accommodation plan was necessary" without regard to whether the parents had requested a plan or not. (Dk. 35, Suzie Eads Dep., Ex. 1, Doc. 43, p. 18). The Officer also concluded that the 504 Committee should have provided individualized accommodations regarding the

school attendance policy for Rachel and should not have allowed the individual teachers to develop and interpret the necessary accommodations. The Officer found "no evidence that R.E. or her parents were discriminated against because of R.E.'s diabetes." (Dk. 35, Suzie Eads Dep., Ex. 1, Doc. 43, p. 17).

19. During the Due Process Hearing, the parents and the 504 Committee developed an appropriate 504 accommodation plan that everyone agreed would meet Rachel's individual educational needs. The Hearing Officer set out the agreed plan in her decision. The Hearing Officer observed that Rachel's prolonged absences hurt her grades, that most teachers allowed make-up work, but that the lower grades "led to the escalating hostilities between the parents" and the teachers. (Dk. 35, Suzie Eads Dep., Ex. 1, Doc. 43, p. 19). The Hearing Officer found "no evidence in any of the materials or at the due process hearing that the district is unable to make the necessary accommodations necessary for R.E." (Dk. 35, Suzie Eads Dep., Ex. 1, Doc. 43, p. 19). Finally, the Hearing Officer ordered that:

> [T]he agreement developed in the due process hearing be immediately implemented. The district should select a section 504 coordinator to ensure enforcement of the provisions of the agreement, act as an intermediary between the teachers and R.E.'s parents and to ease R.E.'s return to classes. This coordinator should be a NEUTRAL third party.
> The Hearing Officer further orders that R.E.'s grades be reviewed under the agreed on accommodation plan. Upward adjustment of some of the grades is likely appropriate.
> The Hearing Officer will retain jurisdiction over this case until the above provisions have been successfully accomplished and to ensure compliance with

the terms of the agreed accommodation plan.

(Dk. 35, Suzie Eads Dep., Ex. 1, Doc. 43, pp. 19–20).

20. Despite the ostensible agreement on accommodations, the Eads timely appealed the Hearing Officer's decision to the District's Board of Education ("Board"). On April 27, 1998, the Board denied the appeal, and it adopted and approved the Hearing Officer's decision except for the provisions regarding the Officer's continuing jurisdiction of the proceeding and the specific selection of a 504 coordinator. The plaintiffs did not pursue any further administrative remedies following the local Board's decision and waited more than nineteen months before filing this judicial action on December 20, 1999.

21. The defendant Betty Gates is a counselor at Wellsville Junior/Senior High School. The defendant Bill Oshel is a mathematics teacher, study skills teacher, and member of the 504 committee. The defendant Mike Trendal is an English and study skills teacher. The defendant David White is a band teacher. Madlyn Adams is a physical education teacher and 504 committee member. Charles Rutledge, Joyce White and Barbara Kessler are 504 committee members. Corrine Gay is a school nurse.

## PLAINTIFF'S CLAIMS

 As stated above, the amended final pretrial order describes the plaintiffs' claims as brought under the federal law of the IDEA and the ADA. There is no mention of Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. §§ 701–796; the Family Educational Right to Privacy Act ("FERPA"), 20 U.S.C. § 1232(g), or the Civil Rights Act of 1871, 42 U.S.C. § 1983 in the pretrial order. "[W]hen parties to a lawsuit fail to object to or move to amend

a pretrial order, that order 'measures the dimensions of the lawsuit both in the trial court and on appeal.' " *Koch v. Koch Industries, Inc.*, 203 F.3d 1202, 1212 (10th Cir.) (quoting *Air–Exec Inc. v. Two Jacks Inc.*, 584 F.2d 942, 944 (10th Cir.1978)), *cert. denied*, 531 U.S. 926, 121 S.Ct. 302, 148 L.Ed.2d 242 (2000). The burden is with the parties, not the court, to assure that the pretrial order accurately reflects their respective positions regarding the issues, legal theories, and all other matters included therein. Likewise, it is the parties' responsibility to make the necessary revisions and later to seek amendments, if necessary, in a timely fashion. Nowhere in the pretrial order do the plaintiffs reference or allege claims under the Rehabilitation Act or 42 U.S.C. § 1983, nor do they move the court for leave to add such claims.

■ The plaintiffs have filed a motion to amend the pretrial order to add an issue of fact and an issue of law regarding whether the defendants violated FERPA in providing Rachel's educational records to other persons. (Dk.52). The amendment of a pretrial order will be permitted only if necessary to prevent manifest injustice. Fed R. Civ. P. 16(e). "[T]he burden of demonstrating manifest injustice falls upon the party moving for modification." *Koch*, 203 F.3d at 1222 (citation omitted). A motion to amend is committed to the district court's sound discretion. *United Phosphorus, Ltd. v. Midland Fumigant, Inc.*, 205 F.3d 1219, 1236 (10th Cir.2000). Factors relevant in the exercise of that discretion include: "(1) prejudice or surprise to the party opposing trial of the issue; (2) the ability of that party to cure any prejudice; (3) disruption to the orderly and efficient trial of the case by inclusion of the new issue; and (4) bad faith by the party seeking to modify the order." *Koch*, 203 F.3d at 1222 (citations omitted). Another factor is whether the moving party acted in a timely manner. *Id.* at 1223.

■ The only factor addressed in the plaintiffs' motion is the lack of prejudice to the defendants. The plaintiffs deny any prejudice because they made these allegations in their original petition or complaint and the defendants have already responded to them. The court, however, finds no mention of FERPA or a claim that FERPA was violated anywhere in the plaintiff's complaint. In their dispositive motions, the defendants ask for summary judgment and do not address any alleged FERPA violation or claim. When the plaintiffs opposed the dispositive motions with allegations concerning a FERPA claim, the defendants replied emphatically: **"THE FAMILY EDUCATIONAL RIGHTS TO PRIVACY ACT (FERPA) IS NOT AN ISSUE IN THIS LAWSUIT."** (Dk.49, p. 3). The defendants argued that the amended pretrial order "filed February 2, 2001, does not include any alleged violation of FERPA as an issue in this lawsuit" and asked the court to strike those arguments and statements from the plaintiffs' brief. *Id.* Over two months after the filing of the defendants' reply brief, the plaintiffs then moved the court to amend the pretrial order.

If the plaintiff were allowed to add a FERPA claim, the prejudice to the defendants would be real and substantial. The plaintiffs have never included this allegation in their complaint or the pretrial order. In reliance on the plaintiffs' failure to plead such a claim, the defendants filed dispositive motions not addressing these factual allegations or the FERPA law governing the same. There is no reason to believe that the defendants conducted any discovery relevant to this FERPA claim and the time for discovery has expired long ago. There would be substantial cost and delay to all if the court were to allow this amendment.

The plaintiffs were not diligent in pursuing this claim in this action. As reflected

in the hearing officer's written decision of March 29, 1998, (Dk.15, Ex. A), the plaintiffs raised an issue whether the teachers had divulged confidential information about Rachel. The plaintiffs, however, did not attempt to plead this claim here until after the discovery had been closed for more than ten months, the pretrial order had been on file for more than seven months, and the summary judgment motions had been fully briefed for more than two months. Finally, the plaintiff's allegations regarding any FERPA claim are so conclusory as to raise serious questions about the viability of any such claim. For all these reasons, the court finds that the plaintiffs have not carried their burden of proving manifest injustice without this amendment to the pretrial order. The plaintiffs' motion is denied.

The plaintiffs' efforts to avoid summary judgment by asserting new claims and allegations will not find success in this court. See *Hanson v. Beloit Newspapers, Inc.*, No. 94–4023 SAC, 1995 WL 646808 at *11 n. 1 (D.Kan. Sept. 15, 1995) (A party may not amend its claims merely by arguing new facts and theories in opposition to the summary judgment motion); *Hullman v. Board of Trustees of Pratt Community College*, 732 F.Supp. 91, 93 (D.Kan.1990) (A party cannot avoid the binding effect of the pretrial order by arguing new issues in its response to summary judgment), *aff'd*, 950 F.2d 665 (10th Cir.1991). "[I]ssues not preserved in the pretrial order have been eliminated from the action, and a party who did not preserve an issue may not use it in resisting a motion for summary judgment." *Hullman v. Board of Trustees of Pratt Com. College*, 950 F.2d 665, 668 (10th Cir.1991) (citation omitted).

### BACKGROUND ON IDEA[3]

The IDEA is a comprehensive education statute that seeks "to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for employment and independent living." 20 U.S.C. § 1400(d)(1)(A). Through the IDEA, federal funds are distributed to states for the education of children with disabilities. In order to receive these funds, the states must have in effect a policy which assures "[a] free appropriate public education is available to all children with disabilities." 20 U.S.C. § 1412(a)(1)(A). A "child with a disability" is defined as a child who needs special education and related services because of certain impairments, disturbances or conditions, including a "health impairment."[4] 20 U.S.C. § 1401(3)(A). A "free appropriate public education" ("FAPE") refers to the "special education and related services"[5] that are furnished at state ex-

---

**3.** Congress amended the IDEA in 1997 with the amendments effective June of 1997. Pub.L. No. 105–17, 111 Stat. 37 (1997). Because the material events here occurred after that date, the court applies and cites to those provisions. Neither side suggests the amendments in 1997 or those in 1999 affect the analysis or outcome of this case.

**4.** The relevant regulation defines "other health impairment" to mean "having limited strength, vitality or alertness, including a heightened alertness to environmental stimuli, that results in limited alertness with respect to the educational environment, that—(i) Is due to chronic or acute health problems such as asthma, attention deficit disorder or attention deficit hyperactivity disorder, *diabetes*, epilepsy, a heart condition, hemophilia, lead poisoning, leukemia, nephritis, rheumatic fever, and sickle cell anemia; and (ii) Adversely affects a child's educational performance." 34 C.F.R. § 300.7(c)(9) (italics added).

**5.** " '[S]pecial education' means specially designed instruction, ..., to meet the unique needs of a child with a disability." 20 U.S.C. § 1401(25). " '[R]elated services' means ... such developmental, corrective, and other

pense, meet state agency standards, include an appropriate education, and are determined and provided according to an "individualized education program" ("IEP"). 20 U.S.C. § 1401(8). An IEP is a written statement that, among other things, describes the disabled child's abilities and unique needs, outlines education goals, and prescribes the services required to meet those needs and goals. *See* 20 U.S.C. §§ 1401(20), 1414(d).

To receive federal assistance under the IDEA, states must "establish and maintain procedures ... to ensure that children with disabilities and their parents are guaranteed procedural safeguards with respect to the provision of" FAPE. 20 U.S.C. § 1415(a). The IDEA specifies what procedures must be established, including "an opportunity to present complaints with respect to any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to such child." 20 U.S.C. § 1415(b)(6). Upon filing a complaint, the parents are entitled to an impartial due process hearing to be conducted either by the state or local educational agency. 20 U.S.C. § 1415(f)(1). If the local agency holds the hearing, then the parent may appeal to the state educational agency which must "conduct an impartial review." 20 U.S.C. § 1415(g). A "party aggrieved by the findings and decision" in the due process hearing who cannot appeal to the state educational agency or a party aggrieved by the findings and decision of state educational

agency on appeal may seek judicial review. 20 U.S.C. § 1415(i)(2)(A).

Under the special education for exceptional children act in Kansas, K.S.A. §§ 72–961 *et seq.*, the due process hearing is conducted at the local level by a hearing officer, K.S.A. § 72–973, with the right to appeal to the state board of education, K.S.A. § 72–974. The board's decision on appeal is made by an appointed review officer. K.S.A. § 72–974(b)(1). The board's review officer's decision is subject to judicial review. K.S.A. § 72–974(c).

## FAILURE TO EXHAUST ADMINISTRATIVE REMEDIES

■ As outlined above and summarized now, the exhaustion requirements of the IDEA are found in several provisions. Subsections (f) and (g) address respectively an administrative due process hearing and appeal. 20 U.S.C. § 1415. Subsection (i)(2), entitled "Right to bring civil action,"[6] "indicates that an aggrieved party may file a civil action only after an appeal has been made under subsection (g) or after a due process hearing from which the party does not have the right to appeal." *Falzett v. Pocono Mountain School Dist.,* 150 F.Supp.2d 699, 702 n. 3 (M.D.Pa.2001). Thus, subsection (i)(2) establishes the exhaustion requirement for IDEA actions. A subsequent provision extends the exhaustion requirement to actions under other federal laws whenever the relief sought is also available under the IDEA:

Nothing in this chapter shall be construed to restrict or limit the rights,

---

supportive services ... as may be required to assist a child with a disability to benefit from special education." 20 U.S.C. § 1401(22).

**6.** Subsection (i)(2)(A) reads:
"Any party aggrieved by the findings and decision made under subsection (f) or (k) of this section who does not have the right to an appeal under subsection (g) of this section,

and any party aggrieved by the findings and decision under this subsection, shall have the right to bring a civil action with respect to the complaint presented pursuant to this section, which action may be brought in any State court of competent jurisdiction or in a district court of the United States without regard to the amount in controversy."

procedures, and remedies available under the Constitution, the Americans with Disabilities Act of 1990 [42 U.S.C. § 12101 *et seq.*], title V of the Rehabilitation Act of 1973 [29 U.S.C. § 791 *et seq.*], or other Federal laws protecting the rights of children with disabilities, except that before the filing of a civil action under such laws seeking relief that is also available under this subchapter, the procedures under subsections (f) and (g) of this section shall be exhausted to the same extent as would be required had the action been brought under this subchapter.

20 U.S.C. § 1415(*l*). " 'In other words, when parents choose to file suit under another law that protects the rights of handicapped children—and the suit could have been filed under the EHA [7]—they are first required to exhaust the EHA's remedies to the same extent as if the suit had been filed originally under the EHA's provisions.' " *Hayes v. Unified School Dist. No. 377*, 877 F.2d 809, 812 (10th Cir.1989) (quoting *Mrs. W. v. Tirozzi*, 832 F.2d 748, 756 (2nd Cir.1987)). "The IDEA's mandate is explicit: plaintiffs must exhaust IDEA's impartial due process hearing procedures in order to bring a civil action under subchapter II of IDEA or any 'such law[ ] seeking relief that is also available' under subchapter II of IDEA." *Weber v. Cranston School Committee*, 212 F.3d 41, 53 (1st Cir.2000).

■ This exhaustion requirement of the IDEA serves several important purposes: (1) permitting the exercise of agency discretion and expertise on issues requiring these characteristics; (2) allowing the full development of technical issues and a factual record prior to court review; (3) preventing deliberate disregard and circumvention of agency procedures established by Congress; and (4) avoiding unnecessary judicial decisions by giving the agency the first opportunity to correct any error.

*Association for Community Living v. Romer*, 992 F.2d 1040, 1044 (10th Cir.1993) (quoting *Hayes*, 877 F.2d at 814). "[T]he IDEA's statutory exhaustion requirement is jurisdictional in nature." *Falzett v. Pocono Mountain School Dist.*, 150 F.Supp.2d at 701 n. 2 (citing *W.B. v. Matula*, 67 F.3d 484, 493 (3rd Cir.1995)); *see Babicz v. School Board of Broward County*, 135 F.3d 1420, 1422 (11th Cir.), *cert. denied*, 525 U.S. 816, 119 S.Ct. 53, 142 L.Ed.2d 41 (1998); *Urban v. Jefferson County School Dist. R–1*, 89 F.3d 720, 724, 729 (10th Cir.1996) (affirmed dismissal of two claims "for lack of subject matter jurisdiction" in that the plaintiffs had not exhausted the IDEA's administrative remedies); *but see Charlie F. by Neil F. v. Board of Educ. of Skokie School District 68*, 98 F.3d 989, 991 (7th Cir.1996) ("lack of exhaustion usually is waivable, as lack of jurisdiction is not"). "If a plaintiff is required to exhaust administrative remedies, but fails to, federal courts are without jurisdiction to hear the plaintiff's claim." *Witte v. Clark County School Dist.*, 197 F.3d 1271, 1274 (9th Cir.1999) (citing *Dreher v. Amphitheater Unified School Dist.*, 22 F.3d 228, 231 (9th Cir.1994)).

■ A court lacking subject matter jurisdiction must dismiss the cause at any stage of the proceeding in which it becomes apparent that jurisdiction is lacking. *Laughlin v. Kmart Corp.*, 50 F.3d 871, 873 (10th Cir.), *cert. denied*, 516 U.S. 863, 116 S.Ct. 174, 133 L.Ed.2d 114 (1995). The lack of subject matter jurisdiction may not be waived or conferred by "consent, inaction or stipulation." *Basso v. Utah Power & Light Co.*, 495 F.2d 906, 909 (10th Cir.

---

**7.** The predecessor to the IDEA was the Education of the Handicapped Act ("EHA") which included a provision at 20 U.S.C. § 1415(f) (1986) nearly identical to the current version of 20 U.S.C. § 1415(*l*).

1974). As courts of limited jurisdiction, there is a presumption against federal court jurisdiction, and the party invoking federal jurisdiction bears the burden of proof. *Id.*

The plaintiffs make no pretense of contending that they exhausted the administrative remedies available under the IDEA and Kansas law. The uncontroverted facts establish that the plaintiffs did not pursue any administrative procedures under the IDEA[8] and that they did not appeal any local agency decision to the state educational agency. "The IDEA gives federal district courts jurisdiction to review the outcomes of these administrative hearings, but only after the party asserting the challenge has appealed the decision of the hearing to the appropriate state educational agency." *Jackson v. New Hyde Park Memorial High School,* 175 F.3d 1008, 1999 WL 177287 (2nd Cir.1999) (Table) (citing 20 U.S.C. §§ 1415(c), (3)(2); *Heldman v. Sobol,* 962 F.2d 148, 158 (2nd Cir. 1992) (citing in turn *Riley v. Ambach,* 668 F.2d 635, 640–41 (2nd Cir.1981))). Having failed to pursue this avenue of administrative relief, the plaintiffs are unable to say they exhausted their administrative remedies. Therefore, this court is without jurisdiction to review the administrative outcomes or to hear claims seeking relief also available under the IDEA, unless the plaintiff establishes an exception to the exhaustion requirement.

Exhaustion of IDEA's administrative remedies "is not required ... when administrative remedies would be futile, when they would fail to provide relief, or when an agency has adopted a policy or pursued a practice of generally applicability that is contrary to the law." *Urban v. Jefferson County School Dist. R–1,* 89 F.3d at 724 (quotation marks and citation omitted). " 'Whether exhaustion is required under the IDEA in a particular case is a question of law.' " *Witte v. Clark County School Dist.,* 197 F.3d at 1274 (quoting *Doe v. Arizona Dep't of Educ.,* 111 F.3d 678, 681 (9th Cir.1997)). The burden of demonstrating an exception to the exhaustion requirement falls on the party seeking to avoid the requirement. *Rose v. Yeaw,* 214 F.3d 206, 211 (1st Cir. 2000).

The plaintiffs argue the recent case law supports the rule that exhaustion is unnecessary when the remedies sought by the plaintiffs could not be awarded administratively. Accepting the defendants' admission that monetary relief cannot be granted under the ADA or IDEA at the administrative level, the plaintiffs summarily conclude the inadequate remedy exception applies here. The plaintiffs offer no analysis of the relevant case law or of their own claims to support their summary conclusion. (Dk.18, pp. 4–5).[9] This

---

**8.** "The case law confirms that state and federal complaint procedures other than the IDEA due process hearing do not suffice for exhaustion procedures. Even the CRP procedures (formerly known as EDGAR), which implement IDEA, are 'not an adequate alternative to exhausting administrative remedies under IDEA.' " *Weber v. Cranston School Committee,* 212 F.3d 41, 53 (1st Cir.2000) (quoting *Association for Community Living in Colo. v. Romer,* 992 F.2d 1040, 1043–44 (10th Cir.1993)).

**9.** In their complaint, the plaintiffs alleged they had "exhausted all available and ade-

quate administrative remedies under IDEA ... and ADA that further use of administrative remedies, if any, would be useless and of no effect." (Dk.1, ¶.3). The plaintiffs further alleged "[t]hat the administrative remedies available to Plaintiffs do not have the authority to grant the relief requested by Plaintiffs." *Id.* Because the plaintiffs' brief opposing dismissal does not mention futility as a possible exception to exhaustion nor advance facts in support of it and because the plaintiffs' verified complaint offers nothing to support this allegation of futility, other than the availability and adequacy of relief in the administrative

cursory effort at proving an exception to the statutory exhaustion requirement is insufficient to sustain this court's jurisdiction for the reasons given hereafter.

In the pretrial order, it is alleged that Rachel "has suffered physically, emotionally, and educationally because of defendants' failure to recognize her as being eligible and entitled to a free appropriate public education." (Dk.44, p. 5). "All plaintiffs have suffered financially as a result of the acts and non-acts of the defendants." *Id.* The plaintiff entitled her complaint, "Petition for Recovery of Money and in Mandamus for Specific Performance of Duties Pursuant to United States of America, and State of Kansas Laws." (Dk.1). It would appear from these pleadings that the plaintiffs not only seek monetary damages but are also pursuing claims for injunctive or non-monetary relief based on the defendants' alleged failure to provide Rachel Eads with a free appropriate public education and other accommodations required by law. (Dk.44, pp. 4–5, 9).

The plaintiffs erroneously believe there is an old versus a new rule regarding the issue of whether a claim for monetary damages automatically qualifies for the exception to exhaustion requirement. Rather, most courts addressing this issue have held that a plaintiff seeking monetary damages still must exhaust administrative remedies even though money damages may be unavailable under the IDEA or through the administrative process. *Covington v. Knox County School System,* 205 F.3d 912, 916 (6th Cir.2000); *Falzett v. Pocono Mountain School Dist.,* 150 F.Supp.2d at 704 (and citations in each). Some courts have recognized the exception for monetary damage claims under very limited and unique circumstances. *See Covington,* 205 F.3d at 917 (Where "the injured child has already graduated from

the special education school, his injuries are wholly in the past, and therefore money damages are the only remedy that can make him whole—proceeding through the state's administrative process would be futile"); *Witte,* 197 F.3d at 1275–76 (Where the plaintiff claims only monetary damages and "all educational issues already have been resolved to the parties' mutual satisfaction through the IEP process" the plaintiff is not seeking relief available under § 1415(*l*)); *W.B. v. Matula,* 67 F.3d at 495–96 (Exhaustion is not required when the plaintiff seeks only money damages and all other IDEA relief has already been provided under a settlement agreement). The plaintiffs make no effort to show their case bears any resemblance to the unique circumstances in these cases. Indeed, the plaintiffs here seek more than monetary damages and their educational issues remain unresolved.

Of more importance to this court is what the Tenth Circuit has ruled on this issue. In *Padilla,* the Tenth Circuit recently addressed when a plaintiff alleging monetary damages under the ADA or IDEA must still exhaust IDEA administrative procedures:

> Like the Seventh Circuit, we understand "available" relief "to mean relief for the events, condition, or consequences of which the person complains, not necessarily relief of the kind the person prefers," *Charlie F. v. Bd. of Educ.,* 98 F.3d 989, 992 (7th Cir.1996), or specifically seeks. Thus, our primary concern in determining whether a plaintiff must utilize the IDEA's administrative procedures relates to the source and nature of the alleged injuries for which he or she seeks a remedy, not the specific remedy itself. *See Hayes v. Unified Sch. Dist. No. 377,* 877 F.2d 809, 812 (10th Cir.

proceedings, the court finds that no legal or factual basis for this exception exists and that

the plaintiffs have waived this exception by not briefing it.

1989) (stating that the IDEA's remedies must be exhausted before a plaintiff files a non-IDEA suit if that "suit could have been filed under the" IDEA). In essence, the dispositive question generally is whether the plaintiff has alleged injuries that could be redressed to any degree by the IDEA's administrative procedures and remedies. If so, exhaustion of those remedies is required. If not, the claim necessarily falls outside the IDEA's scope, and exhaustion is unnecessary. Where the IDEA's ability to remedy a particular injury is unclear, exhaustion should be required in order to give educational agencies an initial opportunity to ascertain and alleviate the alleged problem. *See, e.g., Charlie F.*, 98 F.3d at 992, 993.

So far as we can tell in the instant case, Plaintiff seeks damages solely to redress the fractured skull and other physical injuries she suffered allegedly as a result of the school district's and board of education's purported ADA violations. Plaintiff makes no complaints regarding her current educational situation. Indeed, she expressly attests that her new school "meets her educational needs" and that she presently receives "the full benefits of a free and appropriate education in an integrated, least restrictive educational environment." Under these narrow circumstances, we fail to see how the IDEA's administrative remedies, oriented as they are to providing prospective educational benefits, could possibly begin to assuage Plaintiff's severe physical, and completely non-educational, injuries. That is not to say damages are unavailable under the IDEA. We have not previously addressed that question and need not to resolve this case. Our holding simply recognizes the fact that even if damages are available under the IDEA they should be awarded in civil actions, not in administrative hearings. *Cf. Covington v. Knox County Sch. Sys.,*

205 F.3d 912, 918 (6th Cir.2000) (stating that damages are "unavailable through the [IDEA] administrative process"); *W.B. v. Matula,* 67 F.3d 484, 494–96 (3d Cir.1995) (holding that IDEA-based § 1983 suits permit damage awards, but damages cannot be awarded during the course of the IDEA's administrative proceedings).

We affirm the district court's denial of Defendants' motion to dismiss for failure to exhaust administrative remedies. Under the narrow circumstances of this case, exhaustion was unnecessary because, so far as we can tell, Plaintiff's ADA claim is not seeking "relief that is also available" under the IDEA.

. . . . .

Moreover, circuit court cases cited by Defendants that have required plaintiffs who seek damages to exhaust their IDEA administrative remedies have done so where the plaintiffs' alleged injuries were educational in nature and therefore presumptively redressable through the IDEA's administrative procedures. *See, e.g., Thompson v. Bd. of Special Sch. Dist. 1,* 144 F.3d 574, 580 (8th Cir.1998) (requiring exhaustion where plaintiff sought damages and one-on-one tutoring to remedy alleged denial of free and appropriate public education, and dismissing § 1983 claim on insufficient evidence grounds); *Charlie F.,* 98 F.3d at 993 (requiring exhaustion where the plaintiff alleged "that his education has suffered"); *N.B. by D.G. v. Alachua County Sch. Bd.,* 84 F.3d 1376, 1378 (11th Cir.1996) (requiring exhaustion where the plaintiff's alleged injuries included segregation from non-disabled children and unnecessary absence from school). Under those distinct circumstances, we would also require exhaustion.

233 F.3d at 1274–75. Thus, the question is whether the plaintiff has alleged any "injuries that could be redressed to any degree by the IDEA's administrative procedures and remedies." *Id.*

■ The plaintiffs' allegations that the defendants failed to accommodate Rachel, failed to provide a free appropriate public education, and then created a hostile environment because of her disability are all "complaints" literally "related" to the "identification, evaluation or educational placement of the child" and to the plaintiffs' efforts to have Rachel receive "a free appropriate public education." *See Weber v. Cranston School Committee,* 212 F.3d at 51. Indeed, the plaintiffs' allegations almost exclusively deal with Rachel's educational needs and the defendants' continuing failure to meet them. Almost all of the plaintiffs' alleged injuries relate to the defendants' past and ongoing failure to provide the necessary educational services. The alleged injuries are "educational in nature and therefore presumptively redressable through IDEA's administrative procedures." *Padilla,* 233 F.3d at 1275 (citations omitted). Unlike *Padilla, Witte, Covington* or *Matula,* there are no unique circumstances here that show the educational issues and injuries being claimed here and redressable under the IDEA have been resolved or are otherwise moot. Nor is this a case where the plaintiffs no longer make a claim for prospective relief regarding a free appropriate public education. Consequently, this is a case where the reasoning in *Padilla* would require the exhaustion of administrative remedies.

This court has no choice but to dismiss this case for lack of jurisdiction pursuant to 20 U.S.C. § 1415(*l*). *See Hayes v. Unified School Dist. No. 377,* 877 F.2d at 814; *Marlana G. ex rel. Odle v. Unified School Dist.,* 167 F.Supp.2d 1303, 1307–08 (D.Kan. 2001); *Falzett,* 150 F.Supp.2d at 706. Having dismissed the federal claims over

which this court has original jurisdiction, the court declines to exercise supplemental jurisdiction on the plaintiff's state law claims against the defendant. 28 U.S.C. § 1367(c)(3); *United Mine Workers v. Gibbs,* 383 U.S. 715, 725–26, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966) ("[I]f the federal claims are dismissed before trial, ... the state claims should be dismissed as well."). When the federal claims have dropped from the case, the seminal teaching of *Gibbs* is that the most common response is to dismiss the state law claims without prejudice. *Roe v. Cheyenne Mountain Conference Resort, Inc.,* 124 F.3d 1221, 1237 (10th Cir.1997). The parties do not argue any unique circumstances, and the court finds none, that would justify exercising supplemental jurisdiction over plaintiffs' state law claims against the defendants.

IT IS THEREFORE ORDERED that the defendants' motion for summary judgment or in the alternative to dismiss (Dk.14) and motions for summary judgment (Dks. 34 and 37) are granted to the extent that the federal claims are dismissed for lack of jurisdiction and the state law claims are likewise dismissed without prejudice.

IT IS FURTHER ORDERED that the plaintiffs' motion to amend the pretrial order (Dk.52) and motion for oral argument (Dk.53) are denied.